Mayday, Incorporated. I am able to welcome, and I represent the County of Sean Perry, and I'm honored to serve as the next Governor of Sacramento. This is a use of force case with an encouraging outcome. Officer Perry, some of you have probably seen him. He's been working for two days. He will be coming to you, he will be helping you. He's helping you resolve some of the issues that we've seen in use of force in Sacramento. I know we, I saw Perry was a bystander. He's in a state of emergency. I think the last two cases I worked with, he was in a state of emergency. Correct. I'm sorry, I think he's not a person who's in a state of emergency. Oh, um, he is. In the first instance, I'm sorry, the court has motioned to appeal against the unlawful stay for all, since it's up to the nominee party to decide if they are the nominee. I'm sorry, I didn't hear all that. I thought you just called. I didn't hear you. So, this is a consideration for you to call. Okay. But if he's unlawful stay for all, to the extent supported by the record, the record supporting the unlawful stay for all, what I'm saying is that, if Mark Scabarro is not in jurisdiction for a case, then he should be free to choose. So, if you're saying that Mark Scabarro is not in jurisdiction for a case, then he should be free to choose. That's what you want to say. So, if you are the person that's in favor of this, then you should be free to choose. She said he wasn't in jurisdiction for a case, but the unlawful stay for all is that he had been bruising and swelling to his face, his ear, and his neck, and that he was diagnosed with a headache during a concert he heard later that night. What is that? She said that he was a positive change for her. What's that? Positive change for her. Positive change for her, which there's an argument for positive change really, is that it's a positive change for her. That's what she said. You don't have to be a good person to change her to use her to change her. It's about keeping her conscious of the law and keeping it in the quietest way. So, can you share with us what you did in this case with Mr. Tershanko? So, can I use the next slide? Mr. Tershanko is most important. I have seen some of that as an insult to him. We are seeing the same things. Mr. Tershanko had the time and the patience to do it. Now, you are the absence of representation. You're just standing in front of the microphone. You're calling to say that you need me at that point, and then it's over, and that's the end of it. So, first of all, you are having to cease to exist. That was Mr. Tershanko's statement at the time of the response. This is going forward. And it turns out that Mr. Tershanko wanted us to have the say and the same request that we had called, or I hope we had called, and that's what we did. There is, or he was, as you say, standing still. There is, in fact, in the I.E. statement, we see here in the statement that Mr. Berry-Jay, he says, at the time of the shooting, Mr. Tershanko was standing still. And it's very justified that Mr. Tershanko was standing on his feet when his X-rays continued to advance. And he also testified that Mr. Tershanko was overbearing. So, it's a statement that Mr. Berry made that he was standing. And Mr. Tershanko's statement, I mean, it's the same request as the one that we had at the evidence time. It's a very substantive testimony. In the end, it's a good statement. We're going to have to cease to have evidence for a long period of time in addition to a summary judgment. But we have all the evidence of Mr. Tershanko standing in front of Mr. Berry. And it's important to bring this into our defense as an official hearing. It's something that Mr. Berry also testified that Mr. Tershanko was receiving from him at the time of the shooting. Okay. And also, just to put it short, he was standing overbearing, that Mr. Tershanko was standing overbearing. And I think he's repeating it at the time of the shooting. True. I believe that he is one of the most courageous persons. Berry says that he was straightforward. He's been straight forward. He's brave. He's brave. He's passionate. He's passionate.  He's a good guy. He's a good guy. He's a great guy. He's a great guy. He's a great guy. He didn't have a line of sign that he was actually in the area. So he was moving to the side, and he was rolling his poster down. So, I mean, one of the problems with this case is that the wife was at the site of the shooting, and she could be part of those activities, but they were initially in the SPD. They were outside. They'd be right outside the door. The door was open. So, her recollection comes, of course, with the officers, in terms of what she looked in. She spoke to the SPD. They spoke to members of the SPD. They were special, appropriate, and reliable. They told them they were going to take her to her hospital. They helped her out. And when they tried to go to the penthouse, they were making little circles around the room because they couldn't get control of his arms. And she was on the streetwatchers' station. I'm not sure if she said anything, but they put an elevator up. Lots of SPD officers were waiting in line at the streetwatchers' station. I'm not sure what she said. I think they did not say anything. I guess it was just nothing to constitute anything that the officers said. And she even testified that she heard the team warnings repeatedly, and she called to her as a piece of warning. She also testified that she heard the SPD warning. So, I mean, the interview with Officer Berry, when I got to the center, he said, you know, you can't do what we want you to do. But, you know, they were reliable. Of course, you have to decide. You can't just fix the problem with this. But it was favorable. And I'm not sure that's the case with any other SPD team. Any other SPD team has to do those things. I don't think SPD means that they're standing face-to-face with any of the officers. I mean, that's not a statement of self there, which is a statement of self. It probably doesn't mean a statement of self. I mean, there's a variety of opportunities there. I don't think it means that he's standing. It doesn't mean that he's not coming towards you or that he's not oppressing. I think it means that he's not sitting, that he's not on his knees, that he doesn't tell you what position that he's in. I'm not sure. Of course, he's an officer that's very sensitive in terms of his interview. He was speaking to the program officer, so that's why he was speaking in terms of the interview. He was speaking to the program officer. I don't know if that's what they're saying. I don't know. I don't know what they're saying. What I want to say, what we're obviously very consistent to, is that he was being punished in the interview phase.  But he has not touched onto the fact that he was calling his back. He was in the air. He was not seeing his boots. And this entire thing was getting there. It was pretty immediate and fast. Is there a focus on what it is appropriate, which he is, to see somebody like an officer? You know what I mean? My heart and all your hate. It's going to be consistent. I saw the evidence in this case. And in that case, in this circuit, the court found that the point at which those are hanging down on you, that's just a false use of force. If the purpose of the law of immunity, the burden is on Barry to prove that what he did was lawful, the burden is on the plaintiff to show that Barry was on notice, that what he did was clearly unlawful. So they don't have to bring forward the case to show that these are the specific facts pointing to Barry. And he could not do the things he did. And I want to conclude by being honest, I believe that there is some respect for the seizure use, and the use of deadly force. It's expressed in the seizure use, the relevant time supported by the record, was it clear he was also maintaining a security shackle? That if the security shackle was enlarged, and he was physically resisting the officers who were trying to get him to defer a seizure warning, and that Barry was up in the seizure room on time and charged so low on the seizure shackles. So especially all of the communities looked at these inmates that were running, not TTAs, in that situation, and it's so well-defined for him to secure these shackles at the time. And so that did not occur, and I'm certain that they did not occur in any of the subsequent operations that were done. Some of the time he was using a curbing shackle. Some of the time he was using part of it, and some of the time he was punching and kicking, and grabbing and holding their necktie. But the point is that if you can see in the end, it is on the record that Barry was charged, and it is protected, and it's also on the end of the paper suggested where they put the all-sealing protection that Barry needed for years. Well, the court also says that when you're using a hand pump, you can use it as a force, and Barry was using a hand pump. And the burden is on the plaintiff. So, Barry was on the ice. It would seem to me it was clearly unlawful, and he was charged for it. He was charged for it. So he was on the ice. They could not use it as a force, and they were proven guilty. I'm curious in view of the facts of the case, which is that he was losing consciousness, and he was getting in and out of bed. But that's the point. The question is, how fast was he able to get out of bed? There is no clear evidence on that. So, I'm just trying to draw your attention to that. Because the injured hospital might be actually connected to the initial results of the conversation that he had with the patient. So, it's a question of, you know, how fast do you need to know that you have to use a hand pump before that's starting to become impossible? There's so many stages to the matter, and then he defines them as possible in that sense that they need to know how to use the hand pump in order to get out of bed. They can't just go back to the form of community analysis on the student. There has to be a clear need in the family. So, I'm saying that he was saying that she was wrong about him being a surgeon. That's what you're saying, that she was right. She was the most traditional person. She was wrong about there being conflicting evidence on the fact that he was right to a concept. She was wrong about the clearly established fact that she indicated what you could do. I mean, it was all she said and it was clearly established. I don't see you doing this. Now, I understand you're arguing that he was saying he was stating a different understanding as soon as the results of the case or something like that, and you're trying to get to that. And it was at that point in the trial. So, there are all different points and that's a separate case. Okay, but you're saying that he was saying that he was wrong. That's correct. And he explicitly stated that he was wrong. That would be the case. That would be the answer. You can't do that in any situation. That has to be said. I don't want to see the judge put his arms around that man's injury. That's not true. It's not true. I don't want to see that. That's not true. I don't want to see that. So, the question from the panel is that if he was a guy, sorry, if he was an obstetrologist, he could have slapped her on the chest. Correct. If he was a guy, but then you have the greatest obstetrologist that has slapped her on the chest either way, it still wouldn't be reasonable for us to say, no, it wouldn't be. Well, I mean, I think what you would do is you would have to have a case that you would consider immediately of being so obviously wrong that you do need a case but we do not care about this case. If the previous guy was wrong, if Judge Miller said, how can we define him? If an officer may not use any force in the absence of country to make immediate threats, that is essentially too general a formulation. Thank you. We have time for just a few more questions. If you have any, you may have a few more questions. Thank you. If I may add to that, I think it's very important that we still think about the person that we choose in this case. First of all, I think that it's important to think about because in this case, the person that you choose, the officer, and the law in itself are all importantly describing the officer's conduct and the act that he or she is. It's very important that I highlight that this is a case where the officer can see the person's actions. Locations are visible in the case, in the proceedings, and you're responsible for your actions. If you can testify that he or she is playing an interest in your life, well, it is a possible case. It is a possible case. And I ask for your help in saying that this is a case where you're responsible for your actions. Okay, I agree. This is a case where I understand that there's a serious discrimination on the part of the person including other people in the person according to the law. So, for you, it was a different case because you're not required to testify and you're not required to testify because I don't want you to see this. This case exists. You are the entity. This is the identity. You are the person. You are the person. And you decide for yourself. And I, first of all, should go back and look at the situations, the situations that you see on your way to justice in the manner that's going to apply to justice. There's so many different sorts of rules and there's a lot of different things that go along with it. And it's a very serious and a very fast issue. I'll just go back. This is what's happening. What was the case that this is what's happening? It is a woman in the Department of Health and Human Health and in fact it's the state of Washington. And it basically was a very serious and a very fast issue. I'll go back and look at the video that you see    see on the screen. And I'm just going to go back to what you see on the screen.   to what you see on the screen. The video that you see on the screen is a woman in the Department of Health and Human Health and in fact it's the state of Washington. You can see that she's wearing a yellow jacket. And she walks in and sits down and sits in a very small room. It's not really a restroom. She has a chair and a seat in front of her. She sits down and sits down and sits down and sits down an   and sits  and sits down and she   and she sits down and she walks in and sits down and sits down in other chair s of other people sitting over her and she walks in other chair s of  people sitting over her and she walks in and sits down in s of   sitting over her and   over  and she walks in  other people    and she walks in  sitting over  and she walks walks in and sits   other chair s of s of other people and she is a
judges: Gould, Berzon, Sessions